# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**UNITED STATES OF AMERICA**

**v.**                                          **Case No. 8:25-cr-00379-TPB-AAS**

**ALFREDO JAVIER FUENTES**

_____/

## DEFENDANT'S SUPPLEMENTAL BRIEFING ON COMPETENCY RESTORATION IN A SUITABLE FACILITY

The Defendant, Alfredo Javier Fuentes, by and through his attorney and in support of his motion raising his competency to stand trial (Doc. 73), provides supplemental briefing to the Court on the application of 18 U.S.C. § 4241, what qualifies as a "suitable facility" in the incompetency inquiry, and the Court's authority for judicial review. He asks this Court to find that the Attorney General has abdicated her statutory duty of selecting a suitable facility for each individual defendant who's before her because she's made a blanket delegation of her authority that everyone must be funneled through the Bureau of Prisons. Because she has abdicated her duty, this Court can and must step in to designate the suitable facility for Mr. Fuentes. In support thereof he states and argues as follows:

1

## MEMORANDUM OF LAW

It's been a routine practice in this district to commit incompetent defendants to the custody of the Attorney General ("AG") to await further competency evaluations and for the court to assume that the AG will properly and effectively carry out her statutory duties to select a "suitable facility" for that restoration. The concerning reality is that the AG—tasked by statute with conducting an individualized assessment of what facility will meet the needs of the defendant before her—has delegated her authority to the Bureau of Prisons ("BOP"), and the BOP for its part always selects one of its own medical facilities for restoration. Up until now, everyone has assumed that the AG's facility selection is wholly under her purview with no option for judicial review, but the Supreme Court's jurisprudence and administrative procedures make it clear that judicial review does exist for questions and issues such as this.

What's more, the AG has been consistently and routinely blatantly violating her statutory duties in the competency process resulting in due process violations and violations of antidiscrimination laws. Here, the AG is tasked with conducting an individualized assessment of an incompetent defendant, to determine their specific needs, and to select the facility that's suitable to meet that person's needs before they're sent to a facility for competency restoration. The reality is that there is no such inquiry, no process, no examination, and no

2

input of any kind by anyone to ensure that the AG doesn't abdicate her statutory duties. Everyone goes to the BOP, no matter what.

Mr. Fuentes doesn't subscribe to these assumptions. He seeks to challenge the status quo. The Court has the power to review these agency actions, both inherently under the Constitution and expressly by statute. Failing to act will inexorably violate Mr. Fuentes's constitutional right to procedural and substantive due process under the Fifth Amendment. There must be meaningful inquiry, process, examination, and input by the Court and Mr. Fuentes to ensure that the AG doesn't abdicate her statutory duties.

## I. Judicial review, the proper application of 18 U.S.C. § 4241, and which facilities are suitable to restore a defendant's competency.

This Court is duty-bound under Article III of the Constitution to adjudicate cases and controversies, to discern the meaning of our laws, and to give our laws the power and effect that they command:

> Article III of the Constitution assigns to the Federal Judiciary the responsibility and power to adjudicate "Cases" and "Controversies" — concrete disputes with consequences for the parties involved. The Framers appreciated that the laws judges would necessarily apply in resolving those disputes would not always be clear. Cognizant of the limits of human language and foresight, they anticipated that "all new laws, though penned with the greatest technical skill, and passed on the fullest and most mature deliberation," would be "more or less obscure and equivocal, until their meaning" was settled "by a series of particular discussions and adjudications." The Federalist No. 37, p. 236 (J. Cooke ed. 1961) (J. Madison).

The Framers also envisioned that the final "interpretation of the laws" would be "the proper and peculiar province of the courts." *Id.*, No. 78, at 525 (A. Hamilton). Unlike the political branches, the courts would by design exercise "neither Force nor Will, but merely judgment." *Id.*, at 523. To ensure the "steady, upright and impartial administration of the laws," the Framers structured the Constitution to allow judges to exercise that judgment independent of influence from the political branches. *Id.*, at 522; *see id.*, at 522–24; *Stern v. Marshall*, 564 U.S. 462, 484 (2011).

This Court embraced the Framers' understanding of the judicial function early on. In the foundational decision of *Marbury v. Madison*, Chief Justice Marshall famously declared that "it is emphatically the province and duty of the judicial department to say what the law is." 1 Cranch 137, 177 (1803). And in the following decades, the Court understood "interpreting the laws, in the last resort," to be a "solemn duty" of the Judiciary. *United States v. Dickson*, 15 Pet. 141, 162 (1841) (Story, J., for the Court). When the meaning of a statute was at issue, the judicial role was to "interpret the act of Congress, in order to ascertain the rights of the parties." *Decatur v. Paulding*, 14 Pet. 497, 515 (1840).

The Court also recognized from the outset, though, that exercising independent judgment often included according due respect to Executive Branch interpretations of federal statutes. For example, in *Edwards' Lessee v. Darby*, 12 Wheat. 206 (1827), the Court explained that "in the construction of a doubtful and ambiguous law, the contemporaneous construction of those who were called upon to act under the law, and were appointed to carry its provisions into effect, is entitled to very great respect." *Id.*, at 210; *see also United States v. Vowell*, 5 Cranch 368, 372 (1809) (Marshall, C. J., for the Court).

Such respect was thought especially warranted when an Executive Branch interpretation was issued roughly contemporaneously with enactment of the statute and remained consistent over time. *See Dickson*, 15 Pet. at 161; *United States v. Alabama Great Southern R. Co.*, 142 U.S. 615, 621 (1892); *National Lead Co. v. United States*, 252 U.S. 140, 145–46 (1920). That is because "the longstanding 'practice of the government' "—like any other interpretive aid—"can inform a court's determination of 'what the law is.' " *NLRB v. Noel Canning*, 573 U.S. 513, 525 (2014) (first quoting *McCulloch v. Maryland*, 4 Wheat. 316, 401 (1819); then quoting *Marbury*, 1 Cranch at 177). The Court also gave "the most respectful consideration" to Executive Branch interpretations simply because "the officers concerned were usually able men, and masters of the subject," who were "not

4

unfrequently . . . the draftsmen of the laws they were afterwards called upon to interpret." *United States v. Moore*, 95 U.S. 760, 763 (1878); *see also Jacobs v. Prichard*, 223 U.S. 200, 214 (1912).

"Respect," though, was just that. The views of the Executive Branch could inform the judgment of the Judiciary, but did not supersede it. Whatever respect an Executive Branch interpretation was due, a judge "certainly would not be bound to adopt the construction given by the head of a department." *Decatur*, 14 Pet. at 515; *see also Burnet v. Chicago Portrait Co.*, 285 U.S. 1, 16 (1932). Otherwise, judicial judgment would not be independent at all. As Justice Story put it, "in cases where a court's own judgment . . . differed from that of other high functionaries," the court was "not at liberty to surrender, or to waive it." *Dickson*, 15 Pet. at 162.

*Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 384–87 (2024) (cleaned up and internal citations shortened). The Court's solemn duty to interpret the law applies with equal force to those that govern a defendant's mental competency to stand trial.

The Court also has the power of review under the Administrative Procedure Act in 5 U.S.C. §§ 701–06 for issues such as this. "Congress in 1946 enacted the APA 'as a check upon administrators whose zeal might otherwise have carried them to excesses not contemplated in legislation creating their offices.' " *Loper Bright*, 603 U.S. at 391 (quoting *United States v. Morton Salt Co.*, 338 U.S. 632, 644 (1950)). The APA "specifies that courts, not agencies, will decide "*all* relevant questions of law" arising on review of agency action, § 706 (emphasis added)—even those involving ambiguous laws—and set aside any

such action inconsistent with the law as they interpret it." *Loper Bright*, 603 U.S. at 392 (emphasis in original).

Under the APA, a person who is injured or otherwise adversely affected by "agency action" is entitled to judicial review. 5 U.S.C. § 702. The actions of the AG certainly fall under the purview of "agency action" because an agency means each authority of the government. *Id.* § 701(b)(1); *see also Morris v. Gressette*, 432 U.S. 491, 499–501 (1977) (reviewing actions by the AG under the APA). While actions solely committed to agency discretion are not reviewable, 5 U.S.C. § 701(a)(a), that exception is extremely narrow and only applies where statutes are drawn so broadly that there is no legal standard or principles to apply. *Citizens to Preserve Overton Park, Inc., v. Volpe*, 401 U.S. 402, 410 (1971) (overruled in part on other grounds by *Califano v. Sanders*, 430 U.S. 99 (1977)). The statutes drawn here *do* have legal standards to apply, *infra* at p. 7–10, making the exception against judicial review wholly inapplicable.

"Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires." *Loper Bright*, 603 U.S. at 412. This Court has a duty, both constitutionally and statutorily, to say what the law means in the realm of a defendant's competency to stand trial and which facilities are suitable to restore a defendant's

competency (if it's even possible to restore them). So, let's get down to business and analyze the competency statutory scheme.

Chapter 313 of Title 18 of the United States Code regulates defendants that are impaired by a mental disease or defect, the determination of a defendant's competency to stand trial, the hospitalization of a defendant in a suitable facility for competency restoration and determining whether a defendant is restorable. 18 U.S.C. §§ 4241–48. When a defendant who's suffering from a mental disease or defect is deemed incompetent to stand trial, "the court shall commit the defendant to the custody of the Attorney General." 18 U.S.C. § 4241(d). This is *de facto* involuntary custody.

Section 4241(d) goes on to say that "[t]he Attorney General shall hospitalize the defendant for treatment in a *suitable facility*" to determine their restorability to competency within a reasonable period of time. *Id.* (emphasis added). What's a "suitable facility"? It's a term of art that's defined in Chapter 313, meaning "a facility that is suitable to provide care or treatment *given the nature of the offense and the characteristics of the defendant*." 18 U.S.C. § 4247(a)(2) (emphasis added). Baked into the definition of suitable facility is the requirement for a holistic, individualized assessment that must be completed for every incompetent defendant that's involuntarily hospitalized.

The AG has certain duties and responsibilities in Chapter 313 that she can and must undertake. For instance, she "shall, before placing a person in a facility pursuant to the provisions of section 4241 . . . , consider the suitability of the facility's rehabilitation programs in meeting the needs of the person . . . ." 18 U.S.C. § 4247(i)(C) (emphasis added).[1] Reading §§ 4247(i)(C), 4247(a)(2), and 4241(d) together, the AG must consider the nature of the offense, the defendant's characteristics, and which facility's programs are better suited to meet the defendant's needs *before* placing them in a facility for competency restoration. No ifs, ands, or buts about it.

It's important to note that the AG has delegated her authority and the functions that she must perform under Chapter 313 to the Bureau of Prisons. 28 C.F.R. § 0.96(j). The AG's broad delegation of authority to the BOP appears nowhere in Chapter 313. In so far as the BOP takes the reins here, the regulations governing the psychiatric evaluation and treatment of defendants are found in 28 C.F.R. Part 549—Subpart C, §§ 549.40 to 549.46. The purpose and scope of subpart C "describes procedures for voluntary and involuntary psychiatric evaluation, hospitalization, care, and treatment, in a suitable facility, for persons

---

[1] And it doesn't *always* have to be a federal facility. In fact, the AG has discretion to contract with any state, local, or private agency for purposes of confining, caring, and hospitalizing defendants for competency restoration services. 18 U.S.C. § 4247(i)(A).

in Bureau of Prisons (Bureau) custody," procedures which are authorized by 18 U.S.C. Chapter 313 and 18 U.S.C. § 4042.[2] 28 C.F.R. § 549.40.

Per the regulations, the meaning of " 'hospitalization in a suitable facility' includes the Bureau's designation of inmates to medical referral centers or correctional institutions that provide the required care or treatment." 28 C.F.R. § 549.41. And defendants don't always have to be designated to a medical referral center — they can be placed elsewhere, but the never are. U.S. Dept. of Justice Federal Bureau of Prisons, Program Statement No. 6010.03: Psychiatric Evaluation and Treatment ¶ 2, (July 13, 2011), https://www.bop.gov/policy/progstat/6010_003.pdf (emphasis added).

Further still, the BOP recognizes that involuntarily committing an incompetent defendant is subject to judicial review: "A court determination is necessary for involuntary hospitalization or commitment of inmates pursuant to 18 U.S.C. Chapter 313, who are in need of psychiatric care or treatment, but are unwilling or unable to voluntarily consent." *Id.* at ¶ 6. This is confirmed by the regulations themselves: "***Hospitalization of inmates pursuant to 18 U.S.C. Chapter 313***. A court determination is necessary for involuntary hospitalization

---

[2] An "inmate," per BOP's regulations, "means all persons in the custody of the Federal Bureau of Prisons or Bureau contract facilities, including persons charged with or convicted of offenses against the United States; D.C. Code felony offenders; and persons held as witnesses, detainees, or otherwise." 28 C.F.R. § 500(c).

or commitment of inmates pursuant to 18 U.S.C. Chapter 313, who are in need of psychiatric care or treatment, but are unwilling or unable to voluntarily consent." 18 U.S.C. § 549.45(a) (emphasis in original).

These individualized assessments that Chapter 313 contemplates—ones that must be completed before an appropriate facility is selected—don't appear to be taking place in this district (really in any district). It's common knowledge here that defendants are committed to the custody of the AG (who in turn are in BOP's custody) and they are primarily sent by default to the Federal Medical Center in Butner, North Carolina, for competency restoration.[3] Defaulting to the BOP and an FMC isn't the kind of holistic, individualized assessment that's contemplated—nay required—in Chapter 313. It's not the kind of individualized assessment that's tailor-made to Mr. Fuentes given his unique characteristics; rather, it represents an inflexible policy that unduly restricts the AG's statutory duty to choose a suitable facility that meets his needs.[4] No deference is owed to the AG—or to the BOP for that matter.

---

[3] It's also commonly known that there's a huge backlog of defendants awaiting bedspace at Butner—sometimes waiting as much as four, five, or even six months for a bed while they remain in- or out of custody.

[4] This very issue came up in *United States v. Dalasta*, but the Eighth Circuit didn't resolve this issue since the defendant hadn't raised it in the district court below. 856 F.3d 549, 554–55 (2017). Still, the Eighth Circuit expressed concern about incompetent defendants being committed to the custody of the BOP—as opposed to the AG like the statute says. *Id.* The Eighth Circuit cautioned that the inflexibility of BOP's hospitalization policy for competency restoration "may be unduly restricting the Attorney General's statutory discretion to choose a "suitable facility" if circumstances in an unusual case warranted." *Id.* at 555.

The Court can and must step in to ensure that the AG, and by way of delegation the BOP, completes the necessary assessment before selecting a facility that's suitable to meet Mr. Fuentes's needs. These blanket determinations and default customs of sending defendants to the BOP, hospitalizing them in whichever BOP facility it deems fit, and not making the individualized assessments that Chapter 313 commands. This practice must end. Failing to act here will end up violating Mr. Fuentes's due process rights under the Fifth Amendment.

## II.     Procedural and Substantive Due Process under the Fifth Amendment.

BOP's blanket decision to send Mr. Fuentes to the BOP and to an MRC, most commonly at Butner, without first considering his individual characteristics to determine which facility is suitable to meet his needs under Chapter 313, violates his right to procedural and substantive due process under the Fifth Amendment.

### a.  Procedural Due Process.

Due process requires that there must be appropriate procedures in place that match the deprivation of liberty while also cognizant of the government's interests and needs. *See Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). Here, Mr. Fuentes's liberty interest—not being unnecessarily caged in a BOP facility—is great. That liberty interest is even greater when there's a high risk that

11

committing him to a facility outside his community will cause him irreparable emotional and psychological damage. Sealed Doc. 69 at 7–10. The government's interest here—restoring Mr. Fuentes's competency to continue prosecuting him—mirrors his interests. The government ought to want the best chance of restoring him to competency in a facility that's best suited to his needs.

In balancing Mr. Fuentes's interest in remaining uncaged against the government's interest in restoring him for prosecution, these interests are aligned and aren't diametrically opposed (as they so often are). There are only a few remaining questions then: What protections can be put in place to ensure that Mr. Fuentes isn't erroneously committed to BOP custody instead of an outpatient facility? And does that place an onerous burden on the government?

The protection is for this Court to either step in or force the AG to do its statutory authority: to conduct an individualized assessment to determine what is a "suitable facility" for Mr. Fuentes given his unique circumstances. In conducting such an individualized determination (which the AG has refused to do in every case), the expert's report is clear and unchallenged in that the only suitable facility is one in Mr. Fuentes's community. Sealed Doc. 69 at 10. This individualized determination isn't too heavy of a lift, and it's akin to the individualized assessments that are very common in every criminal case (think of bail determinations and sentences that the Court imposes). Everything in the

criminal legal system is tailored to the individual defendant, but the AG has ignored that constant reality in the competency setting by sending every defendant to a BOP medical facility.

It also isn't a burden because it's the AG's statutory duty. It's no burden for this Court to simply require the AG to comply with what Congress already told her do: to look at the individual who's before her and then determine what facility will meet that specific defendant's needs. Sometimes this assessment could lead to a BOP facility, but it cannot *always* default to a BOP facility. Since the AG refuses to do her statutory duty, this Court can and must step in to be the procedural safeguard against overly restrictive pretrial detention.

In sum, Mr. Fuentes's interest in remaining in his community is aligned with the government's interest in ensuring that he's restored to competency because his best shot at restoration is in the community, and it's not too onerous to ask the AG to comply with her statutory authority and determine that this individual should be restored in the community.

### b. Substantive Due Process.

The AG's current policy of remanding all incompetent defendants to a BOP medical facility violates Mr. Fuentes's substantive due process rights. The substantive due process inquiry begins with what interest is at stake and whether that interest is a recognized fundamental interest. Here, Mr. Fuentes has

a recognized pretrial liberty interest. *See United States v. Salerno*, 481 U.S. 739, 750 (1987).

Because there is a recognized liberty interest, the inquiry then moves to the government's opposing interest and the tailoring of the means to the government's end goal or interest. Admittedly, the means-ends portion of the substantive due process inquiry in the realm of pretrial detention is somewhat muddy and difficult to discern. *See id.* at 749–51. While the Supreme Court's analysis in *Salerno* supports that it applied heightened scrutiny by using terms like "compelling interest" and "narrow circumstances," it also used language such as "legitimate interest" supporting a standard below heightened review. Because of this inconsistency, Mr. Fuentes directs the Court to *Sell v. United States* as an instructive case because (1) it's factually similar and (2) it sets out a clear test. 539 U.S. 166, 180–81 (2003).

As for the factual similarity, *Sell* dealt with involuntary medical treatment for competency purposes. *See id.* at 171. Namely, the government sought to involuntarily administer antipsychotic medication to Sell to try and restore his competency. *Id.* While the government isn't seeking to involuntarily medicate Mr. Fuentes, it's seeking to force medical treatment upon him in the form in inpatient-intensive competency restoration in a BOP institution. Because this case also deals with forced medical treatment, it logically flows to apply the clear test

14

articulated in *Sell* that also sought to determine if that forced medical intervention was constitutional.

Turning then to the test articulated in *Sell*, the Supreme Court set out a clear four-step analysis. *See id.* at 180–81. First, the Court inquired into whether the government had an important interest in that medical intervention. *Id.* at 180. Second, it asked if that medical treatment "*significantly further[ed]*" that governmental interest. *Id.* at 181 (emphasis in original). Third, it asked whether that medical treatment was "*necessary*" to further that interest. *Id.* (emphasis in original). Fourth, and finally, it asked if that treatment was medically appropriate. *Id.*

Applying the *Sell* factors to involuntary inpatient commitment here shows that the AG's blanket determination to commit Mr. Fuentes to a BOP facility doesn't pass constitutional muster. First, the government interest is great, like it was in *Sell*, and Mr. Fuentes doesn't try to diminish that interest. The specific course chosen by the AG and the BOP, however, isn't sufficiently tailored to that governmental interest and doesn't further, let alone significantly further the governmental interest of restoring Mr. Fuentes. This case puts a spotlight on the tailoring issue because the expert's report shows that sending Mr. Fuentes away from his community and into a BOP facility would result in his decompensation, almost guaranteeing he won't be restorable in the future. *See* Sealed Doc. 69 at 10.

15

It's perhaps best to pause here and reiterate the difference between the AG's statutory duties and what the AG does in reality. It's true that § 4241(d) attempted to narrowly tailor the restoration process to the least restrictive means by limiting the length of time one can be hospitalized, thus ending indeterminate lengths of restoration hospitalizations. And it similarly attempted to ensure that the correct facility was selected for each defendant by instructing the AG to select the correct facility for each defendant. But the reality is that every defendant is sent to a BOP facility by the AG, *supra* p. 7–10, with no consideration of the suitability of community restoration and whether in a specific case community restoration might be the way to significantly further its interest.

The AG's blanket determination to send every defendant to a BOP facility is a "scattershot attempt" to incapacitate every incompetent person in the most restrictive facility possible. *See Salerno*, 481 U.S. at 750. If the AG was actually complying with her statutory duty, then it's likely that the means chosen would significantly further the government's interest. If the AG was actually complying with her statutory duty by conducting an individualized assessment for each defendant, then it's likely that the means chosen would significantly further the government's interest. But that's not what's happening. That's a tailoring issue.

Turning then to the remaining two factors, involuntary inpatient commitment in a BOP facility certainly isn't medically necessary or appropriate

16

because the medical expert here has concluded that outpatient community restoration is the only course of action for competency restoration. Sealed Doc. 69 at 10. Accordingly, there is no medical necessity to send Mr. Fuentes to a facility that will guarantee his decompensation. Likewise, it's not appropriate to send Mr. Fuentes — or any person for that matter — to a medical setting that will guarantee irreparable, psychological damage and further decompensation.

It's uncontradicted that community restoration is the best shot at restoration that Mr. Fuentes has. If the AG was actually discharging her statutory duty, then the AG would've conducted this individualized determination and would've reached the same conclusion that the expert reached: that Mr. Fuentes should be restored in the community. But the AG hasn't done that. Instead, the AG sends every incompetent defendant to a BOP facility thus failing to adequately tailor the restoration treatment to Mr. Fuentes and his medical needs.

III.   **The AG's blanket determination for inpatient commitment in a BOP facility violates laws protecting persons with intellectual disabilities.**

If the constitutional due process violations are not concerning enough, the AG's blanket determination also violates antidiscrimination laws and the Department of Justice's ("DOJ") corresponding implementing procedures. Under the Rehabilitation Act of 1973, any executive agency, including the DOJ and the AG, must ensure that any program or activity doesn't discriminate against

17

persons with a disability. 29 U.S.C. § 794(a). Disability includes any physical or mental impairment that "substantially limits one or more major life activities." *Id.* § 705(9)(B); 42 U.S.C. § 12102(1). "Major life activities" includes "learning, reading, concentrating, thinking, communicating." 42 U.S.C. § 12102(2)(A). In this case, Mr. Fuentes has been diagnosed with a mild intellectual developmental disorder along with other learning disorders that all affect his ability to learn, concentrate, and think. Sealed Doc. 69 at 9. Accordingly, he meets the definition for "disability" under the Rehabilitation Act.

To comply with the Rehabilitation Act, the DOJ established its own implementing regulations to ensure that federal programs don't discriminate against persons with disabilities. The implementing regulation requires that the department ensure that any program or activity is administered in the most integrated setting to meet the needs of the person with intellectual disabilities. *See* 28 C.F.R. § 39.130(d) ("The agency shall administer programs and activities in the most integrated setting appropriate to the needs of qualified handicapped persons.").

The notion of using an "integrated setting" is derived out of the Supreme Court case of *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999). In *Olmstead*, the Supreme Court acknowledged that unjustified isolation is discrimination based

18

on disability under the ADA.[5]  527 U.S. at 597. The Supreme Court went on to say that states must provide community-based treatment when appropriate. *Id.* at 607. The Supreme Court asks three questions to determine whether community-based treatment is appropriate: (1) What did the treatment provider say about the appropriateness of community treatment? (2) How does the individual feel about community treatment? (3) Can such treatment reasonably be provided? *See id.* at 587.

Accordingly, under *Olmstead*, the DOJ's own implementing procedures, and the Rehabilitation Act, the AG must consider the need and appropriateness of integrated community settings when selecting the "suitable facility" for competency restoration. The AG hasn't done that and has instead made a blanket decision to automatically confine every person deemed incompetent into a BOP facility. This violates antidiscrimination laws. If we do what the AG should've done and conduct our own analysis under *Olmstead*, it's evident that the most integrated setting for Mr. Fuentes is community-based restoration.

First, the expert has concluded that community treatment is the only way to provide the necessary restoration care. Sealed Doc. 69 at 10. Second, Mr. Fuentes has confirmed with counsel that he wishes to receive treatment in the

---

[5] While *Olmstead* was analyzing the Americans with Disabilities Act, the holding is nonetheless applicable to the Rehabilitation Act because the ADA and Rehabilitation Act are "coextensive." *See Ingram v. Kubik*, 30 F.4th 1241, 1258 (11th Cir. 2022).

community. Third, the state uses facilities for community-based restoration in Hillsborough and Pinellas Counties, so it's possible for Mr. Fuentes to also receive the same or similar treatment in those facilities.

It's ironic that the DOJ has sued states for having similar blanket rules sending individuals with mental impairments and subsequently forced those states to expand services to allow individuals with mental illnesses to thrive in the community and be offered services on a continuum of support. *See* Alexandra Douglas, *Caging the Incompetent: Why Jail-Based Competency Restoration Programs Violate the American with Disabilities Act Under Olmstead v. L.C.*, 32 Geo. J. L. Ethics 525, 562 (2019). It's like the pot calling the kettle black.

Accordingly, under Supreme Court precedent, the Rehabilitation Act, and the DOJ's own implementing procedures, community restoration for Mr. Fuentes specifically is the only option and committing him to the BOP would violate antidiscrimination laws.

* * *

Many in this district assume that the AG—who delegated her authority to the BOP—has carte blanche under Chapter 313, that courts have little if any power of review, and that defendants don't have any say-so in the matter. Pertinent here is the AG's statutory duty to conduct an individualized assessment of an incompetent defendant, to determine what their specific needs

20

are, and to select the facility that's suitable to meet that person's needs before they're sent to a facility for competency restoration. In practice, these individualized assessments aren't happening. Defendants are sent to the BOP by default and to an MRC—almost always to Butner. These assumptions, these norms, must be laid to rest.

The AG cannot abdicate what Congress has mandated her to do: conduct an individualized assessment of every incompetent defendant to determine which facility is suitable to meet their needs for competency restoration. The Court must step in to ensure that the law is being followed to the letter and to ensure that Mr. Fuentes is sent to an appropriate facility that's best suited to meet his individual needs. Inaction isn't an option.

The Court has the inherent power of review under Article III, and Congress has enshrined this bedrock principle of judicial review into the APA. Failure to act will result in the unconstitutional deprivation of Mr. Fuentes's procedural and substantive due process right of liberty and the unequal treatment he'll inevitably receive given his intellectual disability—treatment that the DOJ is duty-bound to protect under antidiscrimination laws.

Respectfully submitted February 25, 2026.

**CHARLES L. PRITCHARD, JR.**
**FEDERAL DEFENDER**

*/s/ Stephen Consuegra*
Assistant Federal Defender
Florida Bar No. 105816
400 N. Tampa Street, Suite 2700
Tampa, Florida 33602
Phone: (813) 228-2715
Fax: (813) 228-2562
E-mail: Stephen_Consuegra@fd.org

## CERTIFICATE OF SERVICE

I HEARBY CERTIFY that on February 25, 2026, a true and correct copy of

the foregoing was furnished by the CM/ECF system with the Clerk of the Court,

which will send a notice of the electronic filing to the following:

AUSA Jeffrey Chang.


_/s/ Stephen Consuegra_
Stephen Consuegra
Assistant Federal Defender